UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

**EQHEALTH ADVISEWELL, INC.**              CIVIL ACTION

**VERSUS**

**HOMELAND INS. CO. OF N.Y.**              NO. 22-00050-BAJ-EWD

## RULING AND ORDER

This is an insurance coverage dispute. Before the Court are the parties' cross-motions for summary judgment. **(Docs. 112, 123)**. Each motion is opposed. (Docs. 123, 129). For the reasons stated herein, Defendant's motion is **GRANTED** and Plaintiff's motion is **DENIED.**

I. BACKGROUND

   A. Facts

The following facts relevant to the Court's analysis are drawn from each party's statement of material facts (Docs. 112-2, 123-3), each party's response to the other's statement of material facts (Docs. 129-1, 137), Plaintiff's reply to Defendant's response (Doc. 132-1), and the record evidence submitted in support of these pleadings.

> **1. Defendant issued Plaintiff a liability insurance policy covering errors and omissions, effective January 16, 2019 to January 16, 2020**

Plaintiff eQHealth AdviseWell, Inc., f/k/a eQHealth Solutions, Inc., is a Louisiana corporation that provides health care management services to Medicaid

1

agencies, commercial healthcare payers, third-party administrators, and self-insured employer groups. (*See* Docs. 123-3, ¶ 1; 123-4, ¶ 3).

Defendant Homeland Insurance Company of New York issued a Managed Care Organizations Errors and Omissions Liability Policy ("the Policy") to Plaintiff, effective from January 16, 2019, to January 16, 2020. (Docs. 112-2, ¶ 1; 112-3; 123-3, ¶ 3). Most relevant here, the Policy covered "Damages and Claim Expenses in excess of the Retention that [Plaintiff is][1] legally obligated to pay as a result of a Claim for . . . an act, error, or omission, or series of acts, errors, or omissions, committed or allegedly committed by [Plaintiff] or on [Plaintiff's] behalf in the performance of a Managed Care Activity."[2] (Docs. 112-2, ¶ 2; 112-3, p. 8; 123-3, ¶ 4). A "Claim," as defined by the Policy, "means any written demand (including a written demand in electronic form) from any person or entity seeking money or services or civil, injunctive, or administrative relief from [Plaintiff]."[3] (Docs. 112-3, p. 11; 123-3, ¶ 16).

---

[1] Specifically, the Policy states: "We will pay on your behalf Damages and Claim Expenses in excess of the Retention that you are legally obligated to pay as a result of a Claim . . . ." (Doc. 112-3, p. 8). "You" is defined by the policy as any Named Insured and any Insured Person—namely, Plaintiff. (Doc. 112-3, p. 15) For clarity, the Court has changed any reference of "You" to "Plaintiff."

[2] The Policy defines "Managed Care Activity" as "any of the following services or activities . . . : Provider Selection or Utilization Review." (Docs. 112-3, p. 11; 123-3, ¶ 5). In turn, the Policy defines "Provider Selection" as "evaluating, selecting, credentialing, contracting with or performing peer review of any provider of Medical Services," and "Utilization Review" as "the process of evaluating the appropriateness, necessity or cost of Medical Services for purposes of determining whether payment or coverage for such Medical Services will be authorized or paid for . . . under any health care . . . plan." (Docs. 112-3, p. 15; 123-3, ¶¶ 6–7).

[3] A "Claim" does not include "(1) any demand or other notice for an internal review or appeal of or under any of [Plaintiff's] policies, practices, procedures, systems, or rules" or "(2) any audit, investigation, or subpoena, including but not limited to any audit, investigation, or subpoena by, or on behalf of, or in the name or right of, or for the benefit of any local, state, federal, or foreign administrative, governmental, or regulatory agency, body, entity, or tribunal." (Docs. 112-2, ¶ 3; 112-3, pp. 11–12).

### 2. Plaintiff authorizes treatment for B.N., a Florida resident, in Oklahoma

One of Plaintiff's contracts was to provide Medicaid management services to the State of Florida. (Doc. 123-4, ¶ 4). Under this contract, Plaintiff's primary operational contact was Florida's Agency for Health Care Administration ("AHCA"), which is the state agency responsible for administering Florida's Medicaid program. (Docs. 112-9, p. 11; 123-4, ¶ 4). As part of its contract, Plaintiff reviewed requests for patients—Medicaid recipients—to receive medical services outside of Florida. (Doc. 123-4, ¶ 5).

One such request for out-of-state services was a Medicaid claim by B.N.,[4] a Florida resident. (Doc. 123-4, ¶ 6). Around August 3, 2018, B.N. was admitted on an emergency basis into non-party Brookhaven Hospital ("Brookhaven"), a licensed psychiatric hospital located in Tulsa, Oklahoma. (Docs. 112-8, pp. 1–2; 123-4, ¶ 7).[5] About two weeks later, a prior authorization request[6] was approved by Plaintiff for B.N. to receive 180 days of inpatient services at Brookhaven, to be paid by Florida's AHCA at a rate of $1,250.00 per day. (Docs. 112-15; 123-4, ¶ 8).

---

[4] For privacy, only B.N.'s initials are identified herein.
[5] Defendant objects to this "fact" as set forth in the Declaration of Liz Willson, Plaintiff's Chief of Staff, arguing that it is impermissible hearsay. (Doc. 129, p. 19). Plaintiff counters that materials filed in support of a Motion for Summary Judgment must be admissible but may be presented in a form which is not necessarily admissible at trial, provided the material may reasonably be expected to come in an admissible form at trial. (Doc. 132, p. 1); *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017). The Court determines that it may consider the facts set forth in Ms. Willson's declarations, particularly as they relate to the prior authorization requests, because this evidence may be presented at trial via testimony or Plaintiff's regular business records.
[6] A "prior authorization" request is the act of approving specific services before they are rendered. (Doc. 112-9, p. 8).

Around January 16, 2019, as the end of B.N.'s initial 180-day period neared, Brookhaven submitted a continued stay authorization request to Plaintiff, requesting an additional 180 days of inpatient services for B.N. (Docs. 112-17; 123-4, ¶ 9). Plaintiff denied Brookhaven's request based on Plaintiff's determination that B.N. no longer met the medical necessity criteria for the level of neurological rehabilitation provided at Brookhaven. (Docs. 112-17; 123-4, ¶ 10). Despite this determination, Plaintiff approved an additional 30 days of inpatient services for B.N. at Brookhaven, so that B.N.'s care could be transitioned to a Florida facility. (Docs. 112-17; 112-19; 123-4, ¶ 11).

B.N. requested a Fair Hearing[7] regarding Plaintiff's denial of the 150 additional days. (Doc. 123-4, ¶ 12). On May 29, 2019, Florida's AHCA entered a final order upholding the denial of the additional inpatient services requested by B.N. (Docs. 112-25; 123-4, ¶ 13). B.N. was discharged from Brookhaven around July 2, 2019, and transported to Florida. (Doc. 123-4, ¶ 13).

### 3. Plaintiff's communications to Defendant regarding B.N.'s treatment at Brookhaven

Much of the dispute in this action concerns the parties' competing views of the relevance and significance of various communications regarding B.N.'s treatment at Brookhaven. For the Court's purpose, the first relevant communication is an April 30, 2019 "Notice of Circumstances" email from Christine Gatlin, a representative of Plaintiff, to Marsh USA, Plaintiff's insurance broker. (Doc. 112-4). Plaintiff's April 30

---

[7] "A Fair Hearing is a proceeding before an administrative law judge in which a party aggrieved by an allegedly incorrect decision concerning Medicaid services may seek relief from the decision." (Doc. 123-4, ¶ 12 n.2).

4

email was intended to report what had occurred at that point related to B.N.'s case to Defendant. Notably, within the email, it states: "We call to your attention that . . . NO CLAIM HAS BEEN MADE TO THE INSURED SO THEY ARE REPORTING THIS AS A CIRCUMSTANCE THAT COULD GIVE RISE TO A CLAIM." (Doc. 112-4, p. 1).

Plaintiff's April 30 Notice of Circumstances email also contained a written timeline of events for B.N.'s treatment at Brookhaven. (Doc. 112-4, pp. 3–4). The timeline, created by Plaintiff, gives brief descriptions of events between May 11, 2018, and April 12, 2019. The timeline also *references* (but does *not* attach) a February 28, 2019, letter sent by Brookhaven to Florida's AHCA. (Doc. 112-4, p. 3). The February 28 Brookhaven letter was addressed to Deputy Secretary Beth Kidder of the AHCA. (Doc. 112-10, p. 1). The Brookhaven letter "disagree[d] with [Plaintiff's] denial of continued services." (Doc. 112-10, p. 3). However, the letter more explicitly stated that:

> Florida AHCA remains liable over this entire matter. The contracts with [Plaintiff] . . . are with AHCA. Brookhaven needs AHCA to ensure all parties are held accountable and working together for the extensive, continuing needs of [B.N.]. Without action, [B.N.] is meeting the criteria for out of state patient dumping by AHCA. Brookhaven does not believe this is the intent of the parties involved, but the current path and results will equate to dumping without action by AHCA. On behalf of [B.N.], we are requesting your immediate attention to resolve the matter and extension of the Agreement.

(Doc. 112-10, p. 4).[8]

---

[8] While the parties dispute the significance of the February 28 letter, they do not dispute that

5

On June 10, 2019, a lawyer with the Jones Law Firm, representing Brookhaven, sent a letter to Florida's Governor, multiple Florida AHCA officials, and a Medicare/Medicaid official. (Docs. 112-20, p. 1; 123-16). Brookhaven's June 10 letter discussed Brookhaven's disagreements with how Florida AHCA handled B.N.'s case. (*See* Docs. 112-20, p. 1; 123-16). Brookhaven's June 10 letter also stated that Dr. Goldberg, a doctor employed by Plaintiff, determined that B.N. was no longer eligible for treatment at the out-of-state facility. (Doc. 123-2, pp. 2–3). The June 10 letter stated that Dr. Goldberg, along with Florida Medicaid were "responsible for locating an organization" in Florida to admit B.N. and provide services. (Doc. 112-20, p. 2).

As far as actual payment is concerned, Brookhaven's June 10 letter stated that "Brookhaven Hospital is entitled to be paid for services already delivered to [B.N.] from August 3, 2018, and seeks authorization from Florida Medicaid that Brookhaven Hospital will be paid for services provided until Florida Medicaid locates a provider willing to take over treatment of [B.N.]." (Doc. 112-20, p. 3). Brookhaven ultimately stated that "suit will be filed against the State of Florida Bureau of Medicaid Policy for breach of the Out-of-State Behavioral Health Reimbursement Agreement . . . . Brookhaven has been left with no other options based on the refusal of Florida Medicaid to pay Brookhaven Hospital for the services provided[.]" (Doc. 112-20, p. 3).

Additionally, on June 17, 2019, Ms. Gatlin forwarded an email from Ms. Liz Willson, Plaintiff's Chief of Staff, to Defendant. (Doc. 123-6). Included in Ms. Willson's June 17 email was a prior email from Tom Crabb, Plaintiff's Florida counsel. (Doc.

---

it was *not* attached to the original April 10 Notice of Circumstances correspondence. Rather, the February 28 letter surfaced later during the course of the litigation.

6

123-6).⁹ Within the email, Mr. Crabb attached Brookhaven's June 10 letter and provided his own commentary on its contents. (Doc. 123-6). Mr. Crabb stated that "[n]o lawsuit has been filed, at least as yet." (Doc. 123-6, p. 1). Mr. Crabb recommended to Plaintiff that it review its E&O insurance policy "to determine whether th[e] letter triggers a reporting requirement." (Doc. 123-6, p. 2). He concluded that "[t]his letter reasonably constitutes threatened litigation. Depending on the language of the policy, it may need to be reported." (Doc. 123-6, p. 2).

### 4. Plaintiff and Florida AHCA's Settlement with Brookhaven

Six months later, on December 12, 2019, Plaintiff "formally tender[ed]" the matter for coverage. (Doc. 112-8, p. 1). To do so, Plaintiff wrote a letter to Defendant, discussing the history of the B.N. matter and informing Defendant that Plaintiff had participated in settlement negotiations with Florida AHCA and Brookhaven and, ultimately, settled the matter in September 2019. (*See* Docs. 112-8, 112-24). Plaintiff's December 12 letter indicated that on June 11, 2019, AHCA's counsel emailed to Mr. Crabb

> a draft settlement agreement with invitation to add eQHealth as a named party. At that point, eQHealth had virtually no choice but to settle on the terms agreed by AHCA and Brookhaven. Had eQHealth refused, then the likely alternative would have been a suit by Brookhaven in federal court against AHCA and eQHealth, with eQHealth not only having to indemnify AHCA for any judgments but for all defense fees and costs. In order to mitigate the total exposure to all parties involved, eQHealth agreed. The settlement agreement was signed by the last parties on September 20, 2019, and pursuant to it, eQHealth paid

---

⁹ Again, Defendant objects to the consideration of this evidence on hearsay grounds. And again, the Court determines that this evidence is properly considered at summary judgment because it likely may be presented in an admissible form at trial. *See* n.5, *supra*.

7

>  Brookhaven $262,500.

(Doc. 112-8, pp. 3–4).

Defendant denied coverage on February 3, 2020, stating that

> [n]o Claim against eQHealth was reported to Homeland, eQHealth did not ask for consent to settle any Claim, and Homeland did not provide prior written consent for the settlement, or for any expense, payment, liability, or obligation eQHealth may have had in relation to this matter. Therefore, no coverage is available for the settlement payment eQHealth made to Brookhaven.

(Doc. 112-32, p. 7).

### B. Procedural History

Plaintiff initiated this action in the Eastern District of Louisiana on July 29, 2021, seeking coverage for B.N.'s claim under the Policy. (Doc. 1). On January 24, 2022, the case was transferred to the Middle District of Louisiana. (Docs. 25–26). Plaintiff was permitted to file a First Amended Complaint on February 1, 2022. (Docs. 30–31). Plaintiff sought leave to file a Second Amended Complaint on September 21, 2022. (Doc. 98). That request was subsequently denied by the Magistrate Judge on May 2, 2023. (Doc. 130).

Now before the Court are the parties' cross motions for summary judgment (Docs. 112, 123).

## II. LEGAL STANDARD

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute regarding a material fact is "genuine"

if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on motions for summary judgment, courts are required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Coleman v. Hous. Indep. School Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

To survive summary judgment, however, the nonmoving party must do more than allege an issue of material fact: "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 402 (5th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Stated differently, the non-movant cannot satisfy its evidentiary burden by relying on conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment is required. *Celotex Corp.*, 477 U.S. at 324.

Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citations and quotation marks omitted). A party that fails to present competent evidence opposing a motion for summary judgment risks dismissal on this basis

9

alone. *E.g., Broussard v. Oryx Energy Co.*, 110 F. Supp. 2d 532, 536 (E.D. Tex. 2000) ("Plaintiff produced no genuine issue of material fact to prevent the granting of Defendant's Motion, and therefore, the Court could grant Defendant's Motion for Summary Judgment on this basis alone.").

### III. DISCUSSION

The parties now agree that Louisiana law controls this coverage dispute.[10] In Louisiana, "the terms of an insurance contract have the effect of law between the parties," *Am. Deposit Ins. Co. v. Myles*, 2000-2457 (La. 4/25/01), 783 So. 2d 1282, 1286–87 (citing La. C.C. art. 1983), and plainly an insurer and an insured may contract to condition coverage on the insured's timely and appropriate notice of a claim. *See generally Anco Insulations, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 787 F.3d 276, 284 (5th Cir. 2015) (citing authorities). Here, Defendant expressly conditioned coverage of *all* claims under the Policy on the filing of notice of a "Claim" against Plaintiff. (Doc. 112-3, p. 8 "([Homeland] will pay on your behalf Damages and Claim Expenses . . . that you are legally obligated to pay as a result of a Claim . . . ."). A "Claim" is "any written demand (including a written demand in electronic form) from any person or entity seeking money or services or civil, injunctive, or administrative relief from you." (Doc. 112-3, p. 11).

When considering what constitutes a "claim" to trigger coverage under a "claims-made" insurance policy, the Fifth Circuit instructs to differentiate the "mere

---

[10] Plaintiff's Amended Complaint seeks damages under Louisiana law or, alternatively, Florida law. (Doc. 31, ¶ 44). Now Plaintiff abandons its Florida law claims by failing to brief them. *See Doe v. Bd. of Supervisors of Univ. of Louisiana Sys.*, --- F.Supp.3d ----, 2023 WL 143171, at *17 n.13 (M.D. La. Jan. 10, 2023) (Jackson, J.).

threat of a claim" from an "actual claim." *F.D.I.C. v. Booth*, 82 F.3d 670, 676 (5th Cir. 1996) (considering what constituted a "claim" as it related to a D&O insurance policy). "To constitute a claim, a demand for something due or believed to be due must be made." *Id.* at 676–677 (quoting *Winkler v. Nat'l Union Fire Ins. Co of Pittsburgh, Pa.*, 930 F.2d 1364, 1367 n.4 (9th Cir. 1991)). To the point, "[a] 'claim' is a demand for a loss *immediately* due." *Id.* at 677 (citing *California Union Ins. Co. v. American Diversified Savings Bank*, 914 F.2d 1271, 1277 (9th Cir. 1990) (emphasis in original).

The Court finds that, despite the numerous communications between the parties and relevant third parties, no communication rose to the definitional level of a "Claim" such that coverage under the Policy was triggered. The Court will analyze separately each relevant communication that Plaintiff argues constitutes a "Claim."

### A. April 30, 2019, Notice of Circumstances

Plaintiff's April 30 "Notice of Circumstances" email—initially reported to Marsh USA, and subsequently sent to Defendant—does not rise to the level of a Claim. Indeed, the body of the document clearly states that "NO CLAIM HAS BEEN MADE . . ." (Doc. 112-4, p. 1). The Notice of Circumstances was merely intended to report what had transpired thus far "as a circumstance that could give rise to a claim" in the future. (Doc. 112-4, p. 1).

The timeline included in the Notice of Circumstances also cannot be deemed a "Claim." The timeline itself was created by Plaintiff. (*Compare* Doc. 112-4, pp. 3–4 *with* Doc. 112-5). The timeline is not a "written demand" from another person or entity—it is Plaintiff's own creation.

11

Finally, to the extent that the Court may consider it,[11] Brookhaven's February 28, 2019, letter to the Florida AHCA that was mentioned in the Notice of Circumstances email, but *not* attached, does not rise to the level of a Claim. The letter was specifically addressed to a Florida AHCA representative and not to Plaintiff. (Doc. 112-10). While Plaintiff is mentioned within the letter, Brookhaven primarily expressed dissatisfaction with the AHCA.[12] (*See* Doc. 112-10). To the extent that Brookhaven disagreed with Plaintiff's denial of a continuation of services and requested further review, Brookhaven sought recourse from Florida AHCA, not Plaintiff. (Doc. 112-25).

### B. Brookhaven's June 10, 2019, Letter

Brookhaven's June 10, 2019, letter regarding the B.N. case also does not rise to the level of a "Claim." The letter was addressed to Florida's Governor, AHCA officials, and a Medicare/Medicaid official, not to Plaintiff. (Doc. 112-20, p. 1). Within the letter, Brookhaven primarily expressed disagreement with "Florida Medicaid." (*See* Doc. 112-20). Plaintiff argues that the letter mentioned Dr. Goldberg, Plaintiff's doctor who determined that B.N. was no longer eligible for treatment at Brookhaven. (Doc. 123-2, pp. 10–11). However, the letter merely stated that Dr. Goldberg and Florida Medicaid "are responsible for locating an organization" in Florida to admit

---

[11] On May 2, 2023, the Magistrate Judge denied Plaintiff's request to amend its Complaint a second time. (Doc. 130). In that request, Plaintiff sought to assert a new theory of when the Claim was reported in writing to Defendant via the February 28, 2019, letter. (Doc. 130).

[12] "*Florida AHCA* remains liable over this entire matter." (Doc. 112-10, p. 4) (emphasis added). "On behalf of [B.N.] we are requesting your immediate attention to resolve the matter." (Doc. 112-10, p. 4). In context, "your" plainly means the letter's intended addressee—AHCA.

12

B.N. and provide services. (Doc. 112-20, p. 2). This statement, in and of itself, is not a request or demand of Dr. Goldberg or Plaintiff. To the contrary, Brookhaven specifically states: "*suit will be filed against the State of Florida Bureau of Medicaid Policy* for breach of the Out-of-State Behavioral Health Reimbursement Agreement . . . ." (Doc. 112-20, p. 3). The letter makes no mention of a future suit to be filed against Plaintiff. Brookhaven's June 10, 2019, letter cannot be considered a "Claim" as the Policy defines it.

### C.  June 17, 2019, Email from Tom Crabb

Plaintiff's June 17, 2019, email, written by Plaintiff's attorney Tom Crabb also obviously is not a "Claim." (Doc. 123-6). It is not written by another person or entity seeking money or services from Plaintiff. To the contrary, it is an internal document.

In sum, because the Court finds that none of the relevant communications prior to the September 2019 settlement between Brookhaven, Florida AHCA, and Plaintiff constituted "Claims" under as defined by the Policy, coverage under the Policy was never triggered.[13]

---

[13] Plaintiff additionally argues, among other things, that Plaintiff's actions constituted covered "errors or omissions," (Doc. 123-2, pp. 1–3), that any claims against both Plaintiff and AHCA should be considered "related claims" as defined by the Policy, (Doc. 123-2, pp. 13–15), that the settlement does not preclude coverage, (Doc. 123-2, pp. 15–19), and that Homeland made arguments in bad faith, (Doc. 123-2, pp. 21–24). Defendant also argues, among other assertions, that Plaintiff violated the voluntary payment provision of the Policy, (Doc. 112-1, pp. 9–13), that there was no "error" on the part of Plaintiff, (Doc. 112-1, pp. 14–17) and that an Indemnification Exclusion in the Policy excludes coverage, (Doc. 112-1, pp. 17–18). Having found that no "Claim" was ever submitted to Defendant and that coverage under the Policy was never prompted, the Court need not discuss either parties' other claims or theories relating to coverage under the Policy.

13

### IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's **Motion for Summary Judgment (Doc. 112)** be and is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's **Cross-Motion for Summary Judgment (Doc. 123)** be and is hereby **DENIED.**

**IT IS FURTHER ORDERED** that the Pretrial Conference and Trial dates in the above-captioned matter be and are hereby **TERMINATED.**

Judgment shall issue separately.

Baton Rouge, Louisiana, this 15th day of July, 2023

_____
**JUDGE BRIAN A. JACKSON
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**